TEXAS & GULF S. S. CO. v. PARKER et al. *

(Circuit Court of Appeals, Fifth Circuit.    March 5, 1920.)

No. 3426.

1. SHIPPING ⬉⬅209(3)—EVIDENCE SHOWED MASTER'S KNOWLEDGE OF APPROACH-
ING HURRICANE BEFORE SAILING.

In proceeding to limit liability, evidence *held* to show that the master of
a small freight steamship, which foundered on a trip from Galveston to
Corpus Christi, knew before leaving Galveston that a dangerous hurricane,
the course of which was not known, was entering the Gulf, and that it
would reach the Texas coast before he could expect to reach Corpus Chris-
ti, or that such information was available on proper inquiry, which he
failed to make.

2. SHIPPING ⬉⬅138—MASTER NEGLIGENT IN ATTEMPTING TO OUTRUN APPROACH-
ING HURRICANE.

Where the master of a vessel knew, or upon proper inquiry might
have ascertained, that a hurricane was approaching, which he would prob-
ably encounter, he was negligent in putting to sea and attempting to out-
run it with a small vessel not adapted to weather it.

3. SHIPPING ⬉⬅138—KNOWLEDGE OF AGENT AS TO MASTER'S INTENTION TO SAIL
CHARGEABLE TO SHIPOWNER.

Where a steamship owner's manager knew of the master's decision to
sail, though he knew or might have ascertained upon inquiry that a
dangerous hurricane was approaching, his knowledge was that of the
owner.

4. SHIPPING ⬉⬅138—OWNER IN PRIVITY WITH MASTER'S NEGLIGENCE, AND NOT
ENTITLED TO LIMIT LIABILITY.

A steamship owner, charged with its manager's knowledge of the mas-
ter's decision to sail when he knew or might have ascertained that a
hurricane was approaching, was in privity with the master's negligence,
and not entitled to limit its liability for the loss of the cargo.

5. SHIPPING ⬉⬅137—STEAMSHIP "UNSEAWORTHY" WHEN NOT ADAPTED TO RE-
SIST APPROACHING HURRICANE.

A steamship, though seaworthy for ordinary weather, was "unsea-
worthy," within the meaning of the Harter Act (Comp. St. §§ 8029–8035),
when she left her home port when her master and manager knew or should
have known that a tropical hurricane was approaching, which she was
not adapted to live out.

[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Unseaworthy.]

6. SHIPPING ⬉⬅141(3)—ACT OF GOD OR PERILS OF SEA NO DEFENSE, WHERE
THEY COULD HAVE BEEN AVOIDED BY DUE CARE.

Under steamship bills of lading excusing the owners from loss occa-
sioned by the act of God or perils of the sea, unaccompanied by contribut-
ing negligence, the exceptions were not available where the steamship
sailed, though her master and manager knew or could have ascertained
that a dangerous hurricane was approaching, as the negligence, and not
the peril of the sea, was the proximate cause of the loss.

Appeal from the District Court of the United States for the South-
ern District of Texas; J. C. Hutcheson, Jr., Judge.

Suit by the Texas & Gulf Steamship Company against Clarence
Parker, in which Hill, Cook & Pope, a corporation, intervened.
From a decree in favor of defendant and intervener, plaintiff ap-
peals. Affirmed.

⬉⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 252 U. S. —, 40 Sup. Ct. 485, 64 L. Ed. —.

Wm. B. Lockhart and John W. Lockhart, both of Galveston, Tex., for appellant.

Marsene Johnson and H. C. Hughes, both of Galveston, Tex., for appellees.

Before WALKER, Circuit Judge, and GRUBB and CALL, District Judges.

GRUBB, District Judge. This is an appeal from the decree of the District Court upon a petition filed by appellant against the appellee Clarence Parker for a limitation of liability, and for protection and benefits of the Harter Act (Comp. St. §§ 8029–8035), and for limitation of its liability as reserved in the bill of lading issued by appellant to appellee Clarence Parker. The other appellee, Hill, Cook & Pope, a corporation, intervened in the proceeding. The final decree of the District Court denied appellant the relief prayed for and awarded the defendant and intervener judgment for the respective amounts claimed by them, with interest from August 18, 1916, the date of the loss of the vessel Pilot Boy, and of its cargo, including the shipments owned by the defendant and by the intervener, which are involved in this suit.

The Pilot Boy was a small freight-carrying steamship, plying between Galveston and Corpus Christi, along the Texas coast. The appellee Parker had shipped an automobile, and the intervener, Hill, Cook & Pope, had shipped a lot of groceries on her from Galveston to Corpus Christi. She left Galveston August 17th, at 3:30 p. m., and foundered about 10 miles from Aransas Pass and 5 miles from shore on August 18th, about 9 a. m., with a total loss of her cargo, including the shipments involved. The owners would have been entitled to a decree limiting their liability to the value of the vessel and pending freight, if the loss occurred without negligence on their part, or of which they had knowledge, or with which they were in privity. Under the Harter Act they would not be responsible for loss due to negligence in the navigation or management of the vessel, provided the owners were free from fault in sending her from her home port. Under the bills of lading, the owners would be excused from loss occasioned by the act of God or perils of the sea, unaccompanied by contributing negligence, of a kind for which they would be liable.

The appellees contend that there was negligence for which the owners were responsible, because of their privity or knowledge, and because it occurred while the vessel was in her home port, which prevents the limitation of liability and the application of the Harter Act to the situation, and which excludes the loss from the terms of the exceptions in the bills of lading.

The claimed negligence consisted in the departure of the vessel from Galveston after the master had received information of an approaching hurricane, or without having received such information through his negligent failure to make inquiry, which would have disclosed it to him, and the privity or knowledge of the owners is

based upon the presence of their manager, one Guyton, at Galveston, on the occasion of the departure of the ship from that port. The questions presented are: (1) Was the master of the Pilot Boy negligent in leaving Galveston when he did? and (2) are the owners of the Pilot Boy shown by the record to have been in privity with the master's negligence, or to have had knowledge of it? The District Court resolved each question in appellees' favor, as it was necessary to do to render a decree in their favor.

[1, 2] 1. The Pilot Boy left the harbor of Galveston on August 17th, at 3:30 p. m., and passed the bar shortly after 5 p. m. It required 18 hours to make the trip between the bar at Galveston and the bar at Corpus Christi. The Pilot Boy could not have expected to reach the bar at Aransas Pass earlier than 11 a. m. on the succeeding day. Was the available information at Galveston, as to the approach of the hurricane, such as to justify the belief that the Pilot Boy would not encounter it on its trip to Corpus Christi, either because of outrunning it, or because of it striking the Texas coast at a point west of Aransas? Warnings of a tropical hurricane were given from Washington August 16th. It was said to be central 200 miles south of Cuba, and moving northwest, and of marked intensity; that hurricane winds were to be expected on the night of the 16th (Wednesday) in the Yucatan Channel; and directed a caution to be given all vessels sailing toward the path of disturbance. On August 17th (Thursday) the office of the local Weather Bureau at Galveston received a warning from Washington via New Orleans:

"Advisory 10 a. m. Tropical disturbance central this morning in Yucatan Channel, passing into Gulf of Mexico, and probably moving a little north of west. Dangerous for vessels to approach its path."

At 8 p. m., on the 17th, the Galveston local office received the following warning from Washington:

"Tropical disturbance has passed into Gulf; no reports available upon which to base estimates of probable course."

No storm warnings were hoisted at Galveston until 7:40 a. m., on the 18th, the day after the Pilot Boy had left Galveston, and the day on which she foundered. When they were hoisted, they affected the whole Texas coast, indicating a storm of 75 miles an hour, from Brownsville to Corpus Christi. We think these records clearly show that the master of the Pilot Boy could have ascertained before sailing the substance of the warning received by the Galveston office at 10 a. m., of the 17th, which was to the effect that the hurricane was then central in Yucatan Channel, and passing into the Gulf, moving north of west, and that it was dangerous for vessels to approach its path. It would have required 24 hours for the hurricane to have reached the Texas coast from the time it entered the Gulf from the Yucatan Channel. The first advisory warning from Washington on the 17th showed that the hurricane began entering the Gulf some time before 10 a. m., when the warning reached Galveston from New Orleans. It was therefore due to reach the Texas coast on the 18th,

about 10 a. m. This was the state of the record in the Galveston office of the Weather Bureau.

It is true that the evidence as to the actual information received by the appellant's manager, Guyton, the master, and the chief engineer, according to their testimony, differed from that stated. There is a conflict as to whether the master communicated with the local Weather Bureau himself. Guyton testified that he was present when the master telephoned the Bureau. The master's testimony, given before the government inspectors, was that he did not, but that his chief engineer did. The information gained by the chief engineer seems not to have influenced the master's decision, for he had started before it was communicated to him. It is also in conflict with what the Bureau records show, and the District Judge might readily have discredited it so far as it conflicted with those records. That the Weather Bureau would have given an assurance of the exact spot where the hurricane was going to strike the Texas coast seems incredible, in view of the absence of data in its records to make any such determination. So late as 8 p. m. of the 17th (after the departure of the Pilot Boy from Galveston) the Galveston office received a warning stating:

"No reports available upon which to base estimates of probable course."

This referred to a time when the hurricane was already in the Gulf. We think the master either had information that the hurricane was entering the Gulf at 10 a. m., or earlier, on the 17th, that its course was not known, that it was dangerous for vessels to approach its course, and that it would reach the Texas Coast somewhere in the forenoon of the 18th, and that the Pilot Boy could not expect to reach the bar at Corpus Christi earlier than 11 a. m. of the 18th, or that information of that character was available in Galveston before the departure of the Pilot Boy upon proper inquiry, which the master failed to make. In either case the master was negligent in the attempt to outrun a hurricane with a small vessel, not adapted to weather it, if encountered, and when the chances of encountering it, based upon the available information, were preponderating.

[3, 4] 2. The remaining question is whether the negligence of the master is to be attributed to the owners of the Pilot Boy, so as to prevent a limitation of liability or an exemption from liability under the Harter Act. Guyton testified that the Pilot Boy was owned by appellant, that he was manager of appellant, and that he had the management of the Pilot Boy, the loading of her cargo, and her movements. The evidence tended to show that he was in Galveston the day the Pilot Boy departed. He said he was present when the master telephoned the Weather Bureau. The evidence also tended to show that he told the master that the boat was loaded and to go ahead. Conceding that Guyton gave no order to the master to sail, and that the master had the responsibility of deciding, still the evidence tended to show that Guyton knew of the master's decision before the departure of the Pilot Boy, and, if it was a negligent one, knew of the master's negligence. Guyton's knowledge was that of

his principal, the appellant, and established privity on the part of the owners, with the negligence of the master, and prevents their limiting their liability for the loss. The Benjamin Noble, 244 Fed. 98, 156 C. C. A. 523.

[5] The Pilot Boy may have been seaworthy for ordinary weather. She was not, because of her size and strength, a boat adapted to live out a hurricane. If she left her home port, when her master and manager knew, or should have known, that a tropical hurricane was approaching her path, dangerous for any kind of vessels to approach, and especially one of her limited size and resistance, then the owners would be responsible for her departure from her home port in an unseaworthy condition, in view of the weather she was likely to encounter, and could not claim the protection of the Harter Act. International Navigation Co. v. Farr & Bailey, 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830; The Adventuress (D. C.) 214 Fed. 838; U. S. v. New York & O. S. S. Co., 216 Fed. 72, 132 C. C. A. 305.

[6] The exceptions in the bills of lading are not available where the act of God or the peril of sea causing the loss could have been avoided by the exercise of due care and diligence. In that event, the negligence, and not the peril of the sea, is deemed the proximate cause of the loss. The Titania (D. C.) 19 Fed. 105; The Exe, 57 Fed. 401, 6 C. C. A. 410; 4 R. C. L. pp. 710 and 717.

The District Court rightly denied appellant's prayer for limitation of liability and exemption, and rendered judgments for appellees, and its decree is affirmed.