# CRAIG v. CONTINENTAL INSURANCE COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 88. Argued November 6, 9, 1891. — Decided November 23, 1891.

The provisions of § 4283 of the Revised Statutes relieving the owner of a vessel from liability for a loss occasioned without his privity or knowledge, apply to an insurance company, to which, as insurer, a vessel has been abandoned, and which was charged with negligence in causing the vessel to be so towed that she sank and became a total loss, and the life of an employé on board of her was lost.

The identity of the vessel was not lost, she being officered and manned and having on board a cargo.

The provisions of § 4283 apply to cases of personal injury and death.

The extinguishment of liability may be availed of as matter of law, on the facts, in a suit to recover for the death of the employé.

The provisions of the statute apply to a vessel used on the Great Lakes; she not being " used in rivers or inland navigation," within the meaning of § 4289.

The insurer being a corporation, the privity or knowledge of a person who was alleged to have been guilty of the negligence, and who was not a managing officer of the corporation, or employed directly by it, and whose powers were no greater than those of the master of a vessel, was not the privity or knowledge of the corporation.

THE court stated the case as follows:

This is an action at law brought by Thomas Craig, administrator of the estate of John Carbry, deceased, against the Continental Insurance Company of New York, a New York insurance corporation, and three other insurance corporations, to recover, under a statute of Michigan, (2 Howell's Annotated Statutes of Michigan, §§ 8313, 8314,) $25,000, as damages for the death of Carbry, for the benefit of his mother and his three minor sisters, as next of kin and distributees of his estate, it being alleged that he lost his life through the negligence of the defendants, in December, 1883. It was commenced in the Superior Court of the city of Detroit, Michigan, and was removed by the defendants into the Circuit Court of the United States for the Eastern District of Michigan.

The defendants were insurers against marine risks of a steam propeller called the Enterprise. While on a voyage on the Lakes, she was stranded, November 20, 1883, on rocks at Green Island, in the northern part of Lake Huron. She had on board a cargo of merchandise and a crew of 10 or 12 men. After the stranding, her owners abandoned her to the insurers, and she became the property of the latter. The general agent of the Continental Insurance Company for the Lake region was Mr. Dimock, of Buffalo, New York, who was also a member of the firm of Crosby & Dimock, of that place, who were general agents for several other companies. James J. Reardon, of Buffalo, was employed by Crosby & Dimock as a marine inspector. Among his other duties was that of going, when notified, to the assistance of wrecked and stranded vessels insured by companies represented by Crosby & Dimock, and getting them to a port of safety. On November 29, 1883, Reardon was notified by Crosby & Dimock in regard to the Enterprise, and went with a steam-tug called the Balize, with steam-pumps and engineers, to the assistance of the Enterprise. One of the steam-pumps was in charge of Carbry. Soon after their arriving at the place where the Enterprise was, her crew being still on board of her and in charge of her, the steam-pumps were set up, and she was pumped out and pulled off from the place where she had stranded. This was done under the supervision of Reardon. She was more or less injured by the stranding, but when she was got off she was towed into deep water, and, although she leaked, she was kept free by the use of one pump for about 66 hours, from 10 o'clock Thursday morning until 4 o'clock the following Sunday morning. Part of her cargo had been removed, but it was replaced. Her machinery was disabled, and it was necessary that the Balize should take her in tow, to remove her to a port where she could be repaired. She started in tow astern of the Balize, bound for Detroit, at 4 o'clock on Sunday morning, December 9, 1883, with her cargo on board and a crew of 13 men, including 4 who were in charge of 2 steam-pumps, one of which was under the care of Carbry. Her mate was in command of her. Reardon was on board of the Balize. No trouble was ex-

perienced in the navigation of the Enterprise, until 2 o'clock on the morning of the next day, 22 hours after she had started ; and then, while off Point aux Barques and Saginaw Bay, she filled and sank and became a total loss, and Carbry lost his life. He was 22 years of age. The declaration alleged that his life was lost through the negligence of the defendants, in particulars which it specified.

The defendants having, in the state court, separately demanded a trial of the matters set forth in the declaration, the action was, after its removal, tried in the Circuit Court of the United States, before the district judge, Judge Brown, (now of this court,) and a jury ; and, under the instruction of the court, a verdict was rendered in favor of the three defendants other than the Continental Insurance Company. The trial proceeded against the latter company, and resulted in a verdict against it for $8000. On motion, and in February, 1886, the verdict was set aside, and a new trial was granted. The opinion of the court on the motion, delivered by Judge Brown, is reported in 26 Fed. Rep. 798. The ground assigned for granting the motion was that the liability of the defendant, if any, was destroyed, because it was subject to the provisions of § 4283 of the Revised Statutes of the United States, and the Enterprise was totally lost during the voyage on which the death occurred. A judgment was then entered in favor of the three defendants other than the Continental Insurance Company.

The new trial was had before Judge Brown and a jury in March, 1886. There is a bill of exceptions, which states that the court instructed the jury to render a verdict in favor of the defendant, which was done. The plaintiff excepted to the instruction of the court. The bill of exceptions contains all the evidence offered on both sides. A judgment in favor of the defendant was rendered in September, 1887, and the plaintiff has brought the case to this court by a writ of error.

It is stated in the bill of exceptions that prior to the sending of the expedition under Reardon to rescue the Enterprise, she had been abandoned by her owners to the Continental Insurance Company, by which she was insured, and had

become its property; and that, by reason of her being sunk at the time Carbry lost his life, she became and was a total loss.

*Mr. Don M. Dickinson* for plaintiff in error.

Does the limited liability act apply not only for the protection of the owners of a *live* ship in case of her wreck and loss, but also after such wreck and loss of this same ship, for the protection against liability of the underwriters, or any one else, from acts of gross negligence when engaged as salvors of anything of value from wreck or cargo?

. If her captain and crew were justified in abandoning the Enterprise (a question for the jury) as a total loss, and if with the means at their command (a question for the jury) they could not have restored her to life, then she lost her character and identity as a ship, and became something else, as truly as a man who dies becomes a corpse. No rights or liabilities pertaining to living men attach to a corpse, and none attach to a total wreck at sea; although there are entirely independent bodies of law dealing with the treatment of dead men and the treatment of wrecks.

If she was a total wreck and the limited liability act applies to the case, then it would also be applicable if the underwriters had towed Carbry out to sea upon any remnant of the ship, or any piece of her, whether it be a hull without a bottom, a bottom without the sides or a plank or two that was under him. In the sense that the underwriters are owners by subrogation, they are the owners of every piece of the wreck, but we submit that they are not the owners in the sense contemplated by this act.

"Ships and vessels" are defined by this court to be "all *navigable* structures intended for transportation." *Cope* v. *Dry Dock Company*, 119 U. S. 625, 629.

*Capen* v. *Washington Insurance Company*, 12 Cush. 517, was a case involving a question of implied warranty as to the condition of a vessel in marine insurance, taken when the vessel was at sea. The court drew the distinction between a sound,

serviceable ship, and one that has ceased to be a ship by becoming a wreck. It held that while in such a case there was no implied warranty on the part of the insured, that the vessel was seaworthy "in the ordinary sense of the term," either when the policy was written or at the time when, by its terms, the risk commenced, yet there was an implied warranty that the vessel was in existence as a vessel, not lost at the time fixed for the commencement of the risk. It said : If she is at sea; when she has sailed in a seaworthy condition, and is safe, (*salvus*, not lost,) so as to be a proper subject for a contract of insurance at the time the risk attaches; and if the vessel is in such condition, and the implied warranty to this extent is not broken, the policy attaches and is not void. . . . But if the vessel was then lost, *become a wreck or had ceased to exist as a vessel*, or was, if at sea, in a condition or under circumstances in which she could not on her arrival in port be made available by reasonable or suitable repairs and fitting for navigation, then there was no subject for the policy to take effect upon, and the contract would be void.

In *Gardner* v. *Salvador*, 1 Mood. & Rob. 116, 117, the court in discussing the question of whether the ship's character was changed by wreck, says : "If the situation of the ship be such that by no means within the master's reach it can be treated so as to retain the character of a ship, then it is a total loss. If the captain, by means within his reach, can make an experiment to save it, with a fair hope of restoring it to the character of a ship, he cannot by selling it turn it into a total loss. If she be in a situation such that, by means which the captain could reasonably use she could not be brought to retain the character of a ship, it is a total loss."

In the case of *The Hendrick Hudson*, 3 Ben. 419, 421, the court discusses the loss of character of a ship in connection with the question of salvage.

The Hendrick Hudson had been a ship, was capable of floating and being towed, but had been converted into a sort of floating saloon. The court (Blatchford, Justice) says: "The fact that the structure has the shape of a vessel, or had been once used as a vessel, or could, by proper appliances, be

again used as such, cannot affect the question. The test is the actual status of the structure, as being fairly engaged in commerce or navigation."

The status as a ship having rights and liabilities under the law as such may thus be lost by misfortune, as by wreck, or by the voluntary act of the owners. A ship which has become "derelict" by *wrecking* (and a ship may become derelict by simple abandonment at sea — Judge Story in *Rowe* v. *Brig* ——, 1 Mason, 372, 373) is one "where there has been an abandonment by officers and crew, without hope of recovery." *The Aquila,* 1 Ch. Rob. 32, 37.

In such a case, if the underwriters had not, as in this case, become the salvors, the right of other salvors might have attached.

Are the negligences of any one in and about the retrieving of value from a *wreck* to be brought within any law relating distinctly and in terms to a "ship" or "vessel"?

Undoubtedly the test as to the wrecked ship must be whether she is capable of navigation by the use of means at hand; if she is not she has lost her character as a ship. And this question is one for the jury, as held in the two cases first above cited. As a matter of fact the evidence was conclusive upon this point. The Enterprise had pounded through many gales, upon the rocks, and had begun to break up so that she perceptibly showed different and independent movements of her bow and stern, of her mast and smokestack; her machinery for steaming was broken up; and she could not navigate or float either by her own means or in tow, as when towed through quiet water, she went to the bottom.

The limited liability act above quoted, stands unaffected for the purposes of this case, by the amendment of June 26, 1884, (23 Stat. 57, c. 121, § 18,) and by the act approved June 19, 1886, extending the provisions of the act to all vessels used on lakes or rivers for inland navigation, etc. 24 Stat. 80, c. 421, § 4.

There is no provision of the act which can be construed as extending the provisions of the limitation so as to include underwriters engaged in salvage.

Section 4286, Revised Statutes, extends the meaning of owners, as used in the act, so as to include "the charterer of any vessel, who shall man, victual and navigate such vessel at his own expense or procurement."

We submit therefore:

*First*, That the limited liability act cannot be construed to cover the case of underwriters engaged in saving wreckage; and,

*Second*, That it would have no application for the benefit of the original owners themselves, except for their protection from liability incurred for the cause of, or in and about the original wrecking; not for any common law liability incurred while engaged about recovering wreckage after the wreck is an accomplished fact, the character as a ship finally lost, and the vessel entirely and properly abandoned by the officers and crew.

*Mr. F. H. Canfield* for defendant in error.

MR. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

The principal contention on the part of the plaintiff is that § 4283 of the Revised Statutes does not apply to the case. That section is as follows: "Sec. 4283: The liability of the owner of any vessel, for any embezzlement, loss or destruction, by any person, of any property, goods or merchandise, shipped or put on board of such vessel, or for any loss, damage or injury by collision, or for any act, matter or thing, lost [loss?], damage or forfeiture, done, occasioned or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." It is contended that the statute does not apply, because the vessel had been wrecked and abandoned to the underwriters; that they cannot be relieved under the statute from their liability for negligence while engaged in saving the wreck or the cargo; and that she had lost her identity as a vessel.

But we are of opinion that her identity was not lost. She was still a vessel. She had lost her own power of locomotion, but she was capable of being towed as a vessel, and was so towed for 22 hours, and until she had accomplished a large portion of her voyage. She was officered and manned, and had on board a cargo. If, during the 22 hours, through the negligence of those on board of her and in charge of her, she had done damage by coming into collision with another vessel and survived, she could have been libelled as a vessel; and she could have been libelled for salvage. She was in the same condition as any vessel which at sea loses her means of propulsion and has to be towed into port.

The fact that, as between her former owner and the insurance company, she had been abandoned as a total loss, does not affect the question. She was abandoned as a total loss to her owner for the purposes of the policy of insurance, but, as in numerous other cases of abandonment, she was abandoned with the privilege to the insurance company of treating her as a vessel and repairing her if it could. Her ownership by the insurance company, resulting from the abandonment, was of the same character as would have been her ownership by any person who had purchased her in her then condition from the former owner. After her abandonment, she entered upon a new career and a new voyage, and § 4283 applies to the liability of the owner of her on such voyage, for damages for the death of Carbry.

It was held by this court, in *Butler* v. *Boston & Savannah Steamship Co.*, 130 U. S. 527, that the provision of § 4283 applies to cases of personal injury and death, as well as to cases of loss of, or injury to, property. Whatever liability there was on the part of the defendant, was extinguished by the loss of the Enterprise, and the extinguishment of such liability may be availed of in this suit, as matter of law, on the facts of the case. *The Scotland*, 105 U. S. 24; *Providence & N. Y. Steamship Co.* v. *Hill Mfg. Co.*, 109 U. S. 578, 594.

The restriction of the statute by § 4289 to vessels not "used in rivers or inland navigation," does not apply to the Enterprise, because she was used on the Great Lakes. *American*

*Trans. Co.* v. *Moore*, 5 Michigan, 368; *Moore* v. *American Trans. Co.*, 24 How. 1.

The only question remaining is as to whether the loss of Carbry's life occurred with the privity or knowledge of the insurance company, it being contended that the knowledge and privity of Reardon were those of the company. But it was held by this court, in *Walker* v. *Transportation Company*, 3 Wall. 150, in regard to the statute (Act of March 3, 1851, § 1, 9 Stat. 635, now § 4282 of the Revised Statutes) which provides as follows: "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage which may happen to any merchandise whatsoever, which shall be shipped, taken in or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner," that, in order to make the owner of a vessel, in case of loss by fire, liable for negligence, it must appear that the owner had directly participated in the negligence. It was there said, that, as the object of the act was "to limit the liability of *owners* of vessels," and the exception was not, in terms, of negligence generally, but only of negligence of the owners, it would be a wrong construction of the act to hold that the exception extended "to the officers and crews of the vessels, as representing the owners;" that § 6 of the act (now § 4287 of the Revised Statutes) showed that it was the purpose of the preceding sections to release the owner from some liability for the negligence and fraud of the master and other agents of the owner, for which those persons were themselves liable and were to remain so; and that, in reference to fires occurring on the vessels to which the statute applied, the owner was "not liable for the misconduct of the officers and mariners of the vessel, in which he does not participate personally." The same rule is applicable to the words "privity or knowledge" in § 4283.

When the owner is a corporation, the privity or knowledge must be that of the managing officers of the corporation. In *Hill Manufacturing Co.* v. *Providence & New York Steamship Co.*, 113 Mass. 495, 499, 500, it was said that the object

of the statute was to exempt the owners of ships from the onerous liability to which they were held by the common law as common carriers or otherwise, for the acts or neglect of their servants or agents, or of third persons, without their own knowledge or concurrence; not to diminish their responsibility for their own wilful or negligent acts; and it was added: "If a loss by fire is caused either by the design or by the neglect of the owners of a ship, the first section of the statute does not limit or take away their common law liability. If the owners are a corporation, the president and directors are not merely the agents or servants, but the representatives of the corporation, and the acts, intentions and neglects of such officers are those of the corporation itself."

The corporation, in the present case, was protected by the statute from loss or damage arising from the fault or negligence of the mate or any of the crew or other employés who were on board of the Enterprise; and *a fortiori* it was protected from loss or damage arising from the fault or negligence of Reardon. The only negligence alleged in the case is that of Reardon, in attempting to tow the Enterprise, in the condition in which she was, to Detroit. But he was not an officer of the corporation, or employed directly by it, but was employed by Dimock, or Crosby & Dimock, the agents at Buffalo. He was at most a mere employé of the corporation. He was not its general agent, nor, so far as appears, had it any knowledge of his appointment. If he was an agent at all, his powers were no greater than those of the master of a vessel, for whose negligence the owner is not liable, even though the privity or knowledge of the master exists. The knowledge of Reardon was not the private knowledge of the corporation.

It is unnecessary to consider any of the other questions discussed at the bar, and the judgment is

*Affirmed.*